Thaddeus Pajak, Appellant, v. Henry Mamsch, Appellee.

Gen. No. 44,371.

Opinion filed June 14, 1949.  Released for publication September 16, 1949.

JOSEPH D. RYAN, LOUIS G. DAVIDSON, LOUIS P. MILLER and ARTHUR RYAN, all of Chicago, for appellant.

ROBERT L. BRODY and MAURICE WEINZELBAUM, both of Chicago, for appellee; ROBERT L. BRODY, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiff was injured when the seat or gondola of a ferris wheel on which he was riding fell from the top of the wheel to the ground.  His suit for damages resulted in a verdict and judgment for defendant, the operator of the wheel, from which plaintiff appeals. As grounds for reversal it is urged (1) that the verdict is against the manifest weight of the evidence, and (2) that certain of defendant's given instructions constituted reversible error.

The accident occurred August 9, 1944.  Plaintiff, then 22 years of age, together with two friends, Joseph Fron and Frank Laff, attended a street carnival that evening, where the ferris wheel was in operation. After walking around the carnival for about three-quarters of an hour, playing various games, they went to a beer garden on the grounds, where they had two or

three beers.  Next they took a ride on the tilt-a-whirl and then proceeded to the ferris wheel near-by.  All of them got into one seat, plaintiff sitting on the left side, Fron in the center, and Laff on the right. They were in an exuberant mood, and being acquainted in the neighborhood, they whistled, shouted and waved at girls, and swung the gondola or seat as the wheel re-volved.  At the conclusion of the ride they got off, purchased more tickets, and proceeded to take another ride, sitting in the same position as before.  During the second ride they continued to shout and yell, whistle and wave at girls, swing the seat, and in gen-eral to "fool around."  The operator, evidently annoyed at their conduct, told them to "cut it out" or to "quit fooling around."  After several turns of the wheel, the operator stopped it to let two young girls off, then stopped it again when plaintiff's seat reached the bottom, and according to plaintiff's witnesses the operator and his helper were "fooling around with some part of the seat" or "took something off" the sides of the seat.  Charles J. Manthei, who was stand-ing near-by, testified that the operator removed the safety pins, and, according to Fron, at the same time the operator said to the boys, "If you guys want a ride, I will give you a ride."  The wheel was then started up, and when it had made a half turn so that plaintiff's seat was at the top, plaintiff said that he heard a click or snap at his side of the seat, which im-mediately gave way, and the seat, after striking several of the beams, fell to the ground, landing thereon in an upright position.

The wheel in question was about 42½ feet high.  It had twelve seats or gondolas with safety locks and had been in operation since 1940.  As one faces the left side of the wheel, it revolves in a counterclockwise direction.  The movement causes the seats to swing. On each side of every seat is a heavy metal hanger or casting, by means of which the seat is hung on two

heavy bolts known as journal bolts, each of which is fastened in a horizontal position to a spoke of the wheel. A flange at the inside end of each journal bolt fits into an inverted U-shaped groove in the seat hanger or casting, and prevents lateral motion of the seat. Lateral motion is further prevented by the shoulder of each journal bolt, which is wider than the portion on which the hanger rests. The safety locks fit into the seat castings and are held in place by a spring. The bottom of the safety lock fits against a metal ridge or ledge on the casting, the effect of which is to hold the lock in place when it is performing its function of supporting the weight of the seat when the seat is upside down.

The evidence shows that after the accident the journal bolts were still attached to the seat of the ferris wheel and were not broken or damaged. The journal bolts, as well as the gondola, were introduced in evidence, inspected by the jury, and were left here for inspection by the court following the oral argument. A physical inspection showed that the castings or hangers on the side of the gondola into which the journal bolts were fitted, were intact and in good condition. The only damage to the gondola was a broken safety bar which was sprung by persons attempting to get plaintiff out of the seat, after the accident, who did not understand the operation of the safety bar. The safety keys were likewise received in evidence, and a physical examination revealed that they were in good order, but the record does not show whether they were in place when the seat fell, nor where they were found after the accident. These keys operate on a spring which is pushed down with the fingers of one's hand to insert or release when the wheel is dismantled, or the gondola is removed. Defendant likewise produced in court, and for inspection here, a reproduction of a gondola as it hangs at the top of the wheel just before it breaks over. All these exhibits were taken into

the jury room after the case was concluded. From this evidence it appears that there was no defect in the ferris wheel or any parts of the gondola.

The case was fairly tried, but since it will in all likelihood have to be retried we consider it unnecessary to recite in detail the conflicting evidence as to how the accident may have occurred. However, from a careful examination of the record we have reached the conclusion that we would not be justified in holding that the verdict was contrary to the manifest weight of the evidence.

Although plaintiff criticizes several instructions, the one to which his counsel principally directed attention on oral argument is No. 20 which reads as follows: "You are instructed that if you believe from the evidence that the plaintiff and the defendant were both guilty of negligence which proximately contributed to the injury or damage complained of, then you are instructed that you have no right to compare the negligence of the plaintiff with that of the defendant, and find a verdict according to which side you think was guilty of the greater degree of negligence, for in such case it is the law that it makes no difference which was guilty of the greater degree of negligence. Under such circumstances the plaintiff cannot recover." This mandatory instruction was misleading as applied to a common carrier, since the jury may have been led to believe that plaintiff was required to exercise the same degree of care as defendant, whereas under the established rule the highest degree of care is imposed on a carrier and only ordinary care is imposed on a passenger. Inasmuch as negligence and contributory negligence were the principal issues submitted to the jury, this instruction may well have been so misleading as to result in the verdict and judgment for defendant.

However, we call the attention of the bar to what was said in *Krug v. Armour & Co.*, Gen. No. 43906, filed 12–30–47 [335 Ill. App. 222], wherein we pointed out

that under section 68 of the Civil Practice Act (Ill. Rev. Stat. 1947, ch. 110, par. 192 [Jones Ill. Stats. Ann. 104.068]) requiring a party moving for a new trial to file the points in writing, "particularly specifying the grounds of such motion," appellants were "precluded from raising any question as to instructions not particularly specified in their motion for a new trial." The same criticism is applicable to this proceeding. Here plaintiff specified eleven general grounds in his written motion for a new trial, but the only items which could refer to the instructions now sought to be criticized are Nos. 7 and 8 as follows: "7. The court erred in giving and reading to the jury the instructions tendered by defendant. 8. The instructions given by the court were confusing and contradictory." None of the instructions are identified by number, and no reasons are particularly specified as to why any of the instructions are claimed to be erroneous.

As shown in *Yarber v. Chicago & Alton Ry. Co.,* 235 Ill. 589, the motion for a new trial was unknown to the common law. It was not until the middle of the seventeenth century that the practice of granting new trials upon motion began to prevail, the first case of a new trial granted upon the merits being *Wood v. Gunston,* Style, 466. (3 Blackstone's Com. 388; Hilliard on New Trials, 4.) The object of the motion for a new trial was not to review any error of law committed by the court, but was to review the question of fact as found by the jury. The granting or denying of the motion was entirely discretionary with the court. No exception could be taken to the decision thereon, nor could it be assigned for error. The Act of June 21, 1837 (Laws of 1837, p. 109) permitted exception to be taken to the overruling of a motion for a new trial. After the passage of that Act courts reviewed the ruling upon evidence and instructions given at the trial and appearing in the bill of exceptions, in the absence of any motion for a new trial. In *McClurkin v. Ewing,* 42 Ill. 283, the denial of a motion for a new trial was

not preserved as a part of the bill of exceptions, and accordingly the court refused to review the evidence, but held that the instructions, to the giving of which exceptions were preserved, were properly before the court for consideration. The same conclusion was reached in *Boyle v. Levings,* 28 Ill. 314. In *Smith v. Gillett,* 50 Ill. 290, no motion for a new trial was made, and it was there held on the authority of *Hayward v. Ormsbee,* 11 Wis. 3, that the court will not review the evidence in the absence of a motion for a new trial and an exception preserved, but will look at the instructions given to the jury. As a result of the rule announced in these decisions a motion for a new trial was held necessary to preserve for review rulings upon the evidence and instructions duly excepted to. The obvious purpose of these changes was to call the court's attention to errors committed in the trial of a cause and afford the court an opportunity to review its own rulings and grant a new trial if substantial error was committed; and unless a motion for new trial was made, rulings upon the evidence and instructions, given or refused, even though duly excepted to, were not preserved for review on appeal of the case. Statutes preceding the Civil Practice Act directing the party moving for a new trial to file the points in writing, particularly specifying the grounds for the motion, were held to be directory and not mandatory. Since it was not required, if the motion was submitted without any statement in writing and without objection, the requirement was waived; but the courts held that if certain points in writing particularly specifying the grounds had been filed, the party would be deemed to waive all causes for a new trial not set forth in his written grounds, and on appeal would be confined to the reasons specified. Numerous such instances are cited in *Krug v. Armour & Co.*

We are not unmindful of the fact that in written motions for a new trial it has been the common practice for many years to assign as one of the grounds

for the motion, error in giving instructions tendered by the opposing party, without particularly specifying any instruction, either by number or subject matter, which is claimed to have misled the jury and possibly resulted in the adverse verdict. It seems to us, however, that this practice entirely disregards the plain provisions of the statute which require a party moving for a new trial to file the points in writing, "particularly specifying the grounds of such motion." "The very purpose of the motion for a new trial is to give the trial court an opportunity to correct its own errors, and if such opportunity is not given by calling the court's attention to the errors charged, the reviewing court would find itself at a loss to assign a valid reason for reversal." *Rubottom v. Crane Co.*, 302 Ill. App. 58. Reviewing courts are constantly being asked to reverse judgments of trial judges for alleged error in the giving or refusing of instructions where, in many instances, the particular instructions criticized on appeal were not called to the attention of the trial judge so as to enable him to correct any error that he may have committed. In the case at bar 42 instructions were offered in all, and 37 of them were given. It places an unfair burden upon the trial judge to require him to examine the numerous instructions frequently given, with a view of determining whether any of them were erroneous. When the motion for a new trial is filed sufficient time has invariably elapsed to enable counsel to examine the instructions and point out particularly those (usually only few in number) which are claimed to have been misleading and prejudicially erroneous. The burden of doing so should rest on the attorney making the motion. It is unfair to a trial judge to reverse him for the giving of erroneous instructions which were not specifically called to his attention, and the practice of challenging *all* the instructions, without specifying the relative few that

become the subject of controversy on review of the case, often results in an appeal which could have been avoided. The language, "particularly specifying the grounds of such motion," was obviously intended to require counsel to specify his reasons with such particularity as to afford the court an opportunity to correct his error. Moreover, opposing counsel should be apprised of the specific reasons assigned for a new trial so that he may be prepared to defend any instruction claimed to have been erroneous. In stating that "the court erred in giving and reading to the jury the instructions tendered by defendant," as was done in this case, or general language to that effect, the party making the motion for a new trial casts the burden upon the court to ferret out errors of which the moving party is well aware, if the assignment is made in good faith, but which cannot be expected to be in the court's mind long after the conclusion of the trial; and by the same token, such a practice affords no notice to opposing counsel which particular instructions will be criticized as ground for reversal. In the case at bar it would have been a simple matter for plaintiff to specify instruction 20 by number or to advise the court in writing that the relative degree of care required by a passenger and common carrier was erroneously stated in the instruction and therefore confusing to the jury.

The courts have not heretofore decided the question in precisely the form presented in *Krug v. Armour & Co.*, but they have at various times dealt with the subject matter of particularly specifying in writing the grounds supporting the motion for a new trial, and have steadfastly held that where a particular ground was not specified, it was waived and not subject to criticism on appeal. (See *Krug v. Armour & Co.* and cases cited therein.)

After the Supreme Court had denied defendant's motion for leave to appeal in the *Krug* case, a group of trial lawyers, designating themselves as *"represent-*

*ative of all* the trial lawyers in this state,'' asked leave to appear in the Supreme Court to urge reconsideration of its order denying the petition for leave to appeal, alleging that they were *"vitally interested* and directly affected'' by our opinion holding that a motion for a new trial ought to set out specifically the instruction or instructions which are claimed to have been erroneous and prejudicial; and they represented to the Supreme Court that if the Appellate Court opinion were allowed to stand, ''the practice as understood by the above-named persons and followed for many years will be changed, and a motion for a new trial will of necessity become a voluminous document, and many questions will arise which will tend to hinder and delay the disposition of litigation rather than to accelerate it.'' (The italics above are ours.) The petition for leave to intervene was denied. It can be readily understood that counsel engaged in the trial of cases should want to save all possible points on appeal, even though some of them are not urged or argued before the trial judge, but that motive does not commend itself to us as a means for facilitating or accelerating litigation or of promoting justice. It is, indeed, difficult to perceive why specifications such as were indicated in the *Krug* opinion, should cause a motion for a new trial to become ''of necessity . . . a voluminous document,'' since the opinion merely suggests that the particular instructions be ''specified.'' This can be done by calling attention to the instruction by number or by a short statement of the subject matter. We do not believe that such practice would in any way ''tend to hinder and delay the disposition of litigation.'' It would, rather, accelerate it, since in many instances the necessity of an appeal would be avoided. Even though the loose practice of objecting generally to all instructions has been followed and countenanced for many years, it should be arrested; and we think it

can and should be corrected, if need be by judicial decision, giving effect to the obvious intendment of the statute. We have elaborated on what was said in the *Krug* case as a means of emphasizing the importance we shall hereafter attach to a fair compliance with the statute.

Because of the erroneous charge to the jury under instruction 20, the judgment of the superior court is reversed and the cause remanded for a new trial.

*Judgment reversed and cause remanded for a new trial.*

SULLIVAN, P. J., and SCANLAN, J., concur.