Angela Shanowat, as Administratrix of the Estate of Elizabeth Shanowat, Deceased, and Beverly Shanowat, a Minor, by Angela Shanowat, Her Mother and Next Friend, Plaintiffs-Appellees, v. Checker Taxi Company, Inc., a Corporation, Defendant-Appellant.

Gen. No. 49,177.

First District, Fourth Division.

April 22, 1964.

Jesmer and Harris, of Chicago (Robert Jay Nye, of counsel), for appellant.

Robert J. Rafferty and Frank R. Petrone, of Chicago, for appellees.

MR. JUSTICE DRUCKER delivered the opinion of the court.

This is an appeal by the defendant, Checker Taxi Company, from judgments entered against it on jury verdicts in the Superior Court of Cook County.

Angela Shanowat, as administrator of the estate of her deceased daughter, Elizabeth, and Beverly Shanowat, a minor, by Angela Shanowat, her mother and next friend, brought suit against defendant corpora-

tion and Ila Sanchez, an individual, on a cause of action arising from an unfortunate and unusual accident which occurred on August 20, 1955. On that day Angela Shanowat, together with her deceased daughter Elizabeth, aged eleven at that time, her nine-year-old daughter Beverly, a son aged fourteen, and a niece aged seventeen, entered a Checker cab and asked to be driven to 1254 Noble Street, the home of Mrs. Shanowat's sister.

The evidence adduced at trial shows that the driver of defendant's cab halted his vehicle across the street from the requested destination. On cross-examination he stated that he knew that the address given him was on the west side of the street, and that in order to reach a point directly in front of that address he would have had to have taken a route involving approximately an extra one hundred feet; but, he added, that passengers "sometimes complain very bitterly" when driven by any but the shortest route to their destination.

The evidence is conflicting as to whether the driver said: "Well, here you are," or whether Mrs. Shanowat stated: "This is it." The parties also differ as to whether one of the children, who were sitting on the "jump seats," opened the right rear door of the cab, or whether the driver reached across and opened it for them. Similarly, there is a conflict in evidence as to whether the Shanowat girls recognized some children playing on the sidewalk and became excited at their arrival. In any event, while Mrs. Shanowat was searching her purse for the fare, the two young girls and the teen-age niece got out of the cab. The niece was standing just outside the open right rear door. The driver, unable to pull to the curb on account of parked cars, had double-parked in the northbound traffic lane. As the Sanchez car approached behind the stopped cab, it slowed to about three miles per

hour, and then accelerated and started to pass the taxi on the left, i. e., in the southbound traffic lane. At this moment Elizabeth and Beverly came out from in front of the cab and ran into the path of the accelerating car. The cab driver testified that he sounded his horn when he saw them running from a point at the corner of his right fender but that they continued running and were struck by the Sanchez vehicle. Mrs. Shanowat denied that the driver sounded the horn. Beverly testified that she and her sister walked to the front of the cab and, after looking both ways, ran. Elizabeth died in the hospital several hours later and Beverly sustained severe lacerations and abrasions on her legs.

Defendant has favored us with an exhaustive and comprehensive brief citing over two hundred cases in support of its argument that there were various errors of law committed in the trial court. We will discuss the points in the order presented.

First, defendant argues that plaintiffs cannot recover because the children had been discharged at a safe place and the carrier-passenger status had thus been terminated. It is conceded that a carrier owes a passenger the highest degree of care during the continuance of the relationship. However, the basic issue which must be decided is whether the carrier-passenger status had in fact terminated.

■ ■ In 4 Blashfield, Cyclopedia of Automobile Law and Practice, § 2142, pp 18–19, the author states:

> The relation ordinarily continues until the passenger has reached his destination and has alighted in safety or has had a reasonable opportunity to do so, as well as to leave the carrier's premises or the place at which he alights. However, with regard to the last mentioned qualification concerning a passenger's opportunity to leave there is ample authority for the view, especially

with reference to busses or other motor carriers, that a person ceases to be a passenger as soon as he safely steps from the vehicle into the street or highway at a reasonably safe and proper place. . . .

*The traveled portion of the street or highway, however, under present-day conditions can hardly be characterized as a place of safety, and a passenger deposited in the traveled portion and injured as a consequence may hold the carrier liable.*

The rule has been applied that where a passenger is discharged in an unsafe place, *the relation of carrier and passenger is not terminated until the passenger, in reasonable exercise of ordinary care for his own safety, has had a reasonable opportunity to reach a place of safety.* (Emphasis added—footnotes omitted.)

The Shanowat children having been discharged into the street, we believe that the relation of carrier and passenger still existed and that the driver accordingly was still bound to exercise the highest degree of care. Rotheli v. Chicago Transit Authority, 7 Ill2d 172, 130 NE2d 172.

Mrs. Sanchez testified that cars were parked solidly on the east side of the street. Mrs. Shanowat reiterated this but added that "the cars were not bumper to bumper." The cab driver testified that there were parked cars as far as he could see; that he stopped opposite a short space between two parked cars; that the door was able to swing open completely; and that there was about a foot and a half of space from the cab to the cars that were parked alongside. Even without affirmative evidence by defendant of safe egress to the east curb, the question of a "reasonably safe place for alighting" was for the jury.

Where the passenger alleges that he was injured after alighting from the conveyance, it is within

86

the province of the jury to determine issues of fact with respect to the carrier's negligence in failing to provide a safe place for the passenger to alight, its negligence in setting down the passenger at an improper place . . . and other issues of fact with respect to its liability. 6 ILP, Carriers, § 520, pp 727–28.

To the same effect see also Lewis v. Checker Taxi Co., 345 Ill App 301, 103 NE2d 193; Jacobsen v. Cummings, 318 Ill App 464, 48 NE2d 603; Paris v. East St. Louis Ry. Co., 275 Ill App 241.

Defendant then argues that a carrier by taxicab is not liable unless the act or omission charged proximately causes an injury that is reasonably to be anticipated and that it is not sufficient for the act or omission to constitute merely a condition through which injury can be caused by an independent act of the injured person or of the third party. We believe that it was for the jury to determine, as a question of fact, whether the negligence of the taxi driver constituted only a condition by which the injuries were made possible or whether, because the subsequent independent act of Mrs. Sanchez in passing the halted cab was or could be found to be foreseeable, the driver's negligence was the proximate cause of the injuries. Ney v. Yellow Cab Co., 2 Ill2d 74, 84, 117 NE2d 74; Johnston v. City of East Moline, 405 Ill 460, 91 NE 2d 401; Lutz v. Chicago Transit Authority, 36 Ill App2d 79, 183 NE2d 579.

In the case of Houston Transit Co. v. Zimmerman, 200 SW2d 848 (Tex Civ App 1947), a somewhat similar situation was presented. There a bus driver discharged two children about five feet from the curb with a large puddle blocking their access to the sidewalk. The children passed in front of the bus and were hit by a passing truck. The court there held that the bus company was negligent and that its

negligence was not excused by an intervening cause, i. e., the negligence of the truck driver. There also the question of whether the children were discharged in a safe place was held to be a question of fact for the jury.

■ Defendant's next point is that under the Illinois Wrongful Death Act (Ill Rev Stats 1961, c 70, § 1) there is no liability unless the proof establishes that there was a wrongful act and that such conduct *directly* caused the death, it being insufficient for the proof merely to show that such conduct contributed to the death.

Although the statute is limited to actions where death is *"caused* by wrongful act, neglect or default" of the defendant, it goes on to provide that "in every case (in which) the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured . . . ." We interpret this provision to mean that a cause of action for wrongful death may be maintained where the defendant was guilty of negligence which proximately resulted in the death. This interpretation is supported by the case of City of Chicago v. Major, 18 Ill 349 (1857) the first case to interpret the Illinois Wrongful Death Act. The court there said, at page 357:

> This is a new cause of action given by this statute, and unknown to the common law, and should not be extended beyond the fair import of the language used; but this it would be difficult to do, for the language is very broad and comprehensive, embracing, in direct and positive terms, *all cases where, if death had not ensued, the injured party could have maintained an action for the injury.* This would seem to leave no room for construction, but refers us at once to the inquiry,

whether an action could have been maintained by the child, for the injury, had he survived it. The act says, *"then, and in every such case,"* the action shall be maintained. *To give a further limitation than this would be, not to construe the statute, but to expunge or disregard a portion of it.* (Emphasis added.)

This rule of interpretation was reaffirmed a century later in Nudd v. Matsoukas, 7 Ill2d 608, 131 NE2d 525 (1956).

Thus, if Elizabeth Shanowat could have maintained an action against Checker had she lived, her administrator may now do so and the question of proximate cause in the wrongful death action was for the jury.

 Defendant's next point is that recovery by the plaintiffs was unjustified, as a matter of law, due to the contributory negligence of both the children and their mother. This court stated in Sphatt v. Tulley, 38 Ill App2d 229, at page 241, 186 NE2d 670:

> . . . contributory negligence on the part of a plaintiff is a matter of fact for the jury to determine unless the question has become one of law, in that all reasonable minds would reach the conclusion that there was contributory negligence. Bunton v. Illinois Cent. R. Co., 15 Ill App2d 311, 146 NE2d 205; Thomas v. Buchanan, 357 Ill 270, 192 NE 215; Geraghty v. Burr Oak Lanes, Inc., 5 Ill2d 153, 125 NE2d 47.

The conduct of the two girls, aged nine and eleven, after alighting from a cab double-parked across the street from a designated destination, while their mother was occupied with paying the fare, would not convince all reasonable men that the mother or the children were contributorily negligent. Together with the conflicting evidence concerning the opening of the

cab door, fact questions were created and decided adversely to the defendant by the jury verdicts.

Defendant further contends that no recovery could be had under the Wrongful Death Act on the grounds (1) that the mother is expressly precluded by statute from sharing in the proceeds due to her contributory negligence was resolved by the jury proof of the existence or survival of any other lineal next of kin. We do not agree with this argument. First, as discussed above, the issue of the mother's contributory negligence was resolved by the jury against Checker. But, even were Mrs. Shanowat personally barred from recovery under the Act, Checker's pleadings admit the survivorship of the father (Ab 12; Ab 41) and, therefore, since she brought this suit in a representative capacity, the judgment would have been for the benefit of the father. Pecuniary injury to lineal heirs of a minor is presumed as a matter of law in Illinois. Rost v. F. H. Noble & Co., 316 Ill 357, 375, 147 NE 258, and Barrow v. Lence, 17 Ill App2d 527, 531, 151 NE2d 120.

Defendant further alleges that the legal effect of the agreement pursuant to which Ila Sanchez, originally a codefendant in the cause, was dismissed from the suit, was such as to constitute a release rather than a covenant not to sue. Were this the case a release granted to one codefendant would operate to discharge his codefendant. Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717. In the Hulke case, at page 24, this court defined the test for construing an instrument as a release or a covenant not to sue in the following terms:

> Whether or not a document is construed as a release, an accord and satisfaction, or a covenant not to sue depends upon the words used, the amount paid, the substance of the agreement and the intention of the parties. The underlying prin-

ciple in construing whether or not a document is or is not a release, an accord and satisfaction, or a covenant not to sue is the basic one that a person is entitled to only one full compensation for his injuries.

Here we have no document to construe. The agreement releasing Ila Sanchez was, at the time of the trial, oral. Only later was it reduced to writing. At the time of the trial, however, Checker itself in its post-trial motion treated the agreement as a covenant not to sue rather than as a discharge. Therefore, we too shall treat it as such and accordingly find that it did not discharge Checker from liability.

Moreover, at the conclusion of the trial, on motion of defendant, the court correctly deducted from the verdict against Checker the amount received by the plaintiffs pursuant to the covenant with Mrs. Sanchez. Burger v. Van Severen, 39 Ill App2d 205, 188 NE2d 373; De Lude v. Rimek, 351 Ill App 466, 115 NE2d 561.

■■ Defendant also avers that the trial court committed prejudicial error in refusing to allow the jury to be informed that Ila Sanchez, who testified as a witness for the plaintiff, had formerly been a co-defendant and had entered into an agreement with the plaintiff whereby she was discharged from the suit.

Section 1 of the Evidence and Depositions Act, Ill Rev Stats 1961, c 51, § 1, reads in part:

> . . . no person shall be disqualified as a witness in any civil action, suit or proceeding, except as hereinafter stated, by reason of his or her interest in the event thereof, as a party or otherwise, or by reason of his or her conviction of any crime; *but such interest or conviction may be shown for the purpose of affecting the credibility of such witness;* . . . (Emphasis added.)

Defendant's position is apparently grounded on the assumption that Ila Sanchez was an interested party in the suit and that her testimony was accordingly subject to impeachment under the above statute. We do not agree. The covenant not to sue, executed before the jury was impaneled, released any and all interest that Mrs. Sanchez previously had in the proceedings.

A similar point was decided by the New Jersey Court of Errors and Appeals in Rynar v. Lincoln Transit Co., Inc., 129 NJL 525, 30 A2d 406. In that suit for personal injuries which was brought by a passenger, the defendant bus company produced as a witness in its behalf another passenger from the same bus who had previously settled with the defendant. We concur with the statement made by the New Jersey court at page 410:

> The fact that a witness had earlier had a claim against the bus company arising out of the accident and had settled the claim for a money payment does not show *present interest* or a fact from which present interest may be fairly inferred. If a person has a claim, he has, of course, an interest. But if his claim is paid and he gives a release, the incident is closed. *The interest no longer exists.* (Emphasis added.)

■ Defendant also asks that the verdict be set aside because of the following statement in plaintiff's closing argument to the jury:

> Think of the very day of the accident; itself—who was together—what were they going to do; the mother, two daughters, a son, a niece, and all going to visit an aunt. *These people, I think, have a standard of closeness, which is somewhat hard for the rest of us to understand. But, I think, it*

92

*does exist; there are far closer ties among the Indian people than there are among us.* What would be a fair and just award for the death claim in this case? Ab 95–96.) (Emphasis added.)

Defendant contends that this appealed to the sympathies of the jury for the plight of the American Indian; and further, that it raised the issue of loss of comfort and society which were not proper elements in measuring damages for wrongful death. We do not view the above statement as being prejudicial when viewing the record as a whole.

But, even assuming that the above statement was objectionable, it appears that defendant waived its objection thereto in failing to get a ruling on its objection at the trial. Department of Public Works & Bldgs. v. Anastoplo, 14 Ill2d 216, 222, 151 NE2d 337; Clubine v. Citro, 238 Ill App 479.

■■ Furthermore, we do not feel, as defendant urges, that the verdicts were so excessive as to require the inference that they were the result of passion and prejudice. The jury returned verdicts of $10,000 in the wrongful death action and $15,000 in the personal injuries action.

The Wrongful Death Act, § 2, at that time provided a statutory maximum award of $25,000. We do not think that an award of forty percent of the statutory maximum for the death of an eleven-year-old girl is so unreasonable as to require reversal as a matter of law.

Similarly, there was evidence in the record sufficient to support the verdict of $15,000 for Beverly Shanowat. There were special damages, in the form of medical and hospital bills, of almost $1,200. The balance of the award is not so patently excessive as not to be reasonably attributed to the jury's estimation of the monetary value of Beverly's disability, scarring, and pain and suffering rather than to passion

93

and prejudice. As was stated by another district of this court in the recent case of Smith v. Broscheid, 46 Ill App2d 117, 196 NE2d 380, at pages 384 and 385:

> The amount of damages to be awarded in a personal injury case is, generally, the prerogative of a jury. A finding as to damages will not be set aside unless it appears to have been the result of passion and prejudice. This rule is so well established that a citation of authorities is unnecessary.

 Finally, defendant complains of several alleged errors in instructions tendered to the jury. However, since defendant failed to specifically point out the instructions objected to in its motion for a new trial, we may not consider such alleged errors. Taylor v. Hughes, 17 Ill App2d 138, 144, 149 NE2d 393. The reasons for such a rule were well stated by Mr. Justice Friend in his opinion in Pajak v. Mamsch, 338 Ill App 337, at page 344, 87 NE2d 147:

> Reviewing courts are constantly being asked to reverse judgments of trial judges for alleged error in the giving or refusing of instructions where, in many instances, the particular instructions criticized on appeal were not called to the attention of the trial judge so as to enable him to correct any error that he may have committed . . . . It places an unfair burden upon the trial judge to require him to examine the numerous instructions frequently given, with a view of determining whether any of them were erroneous. When the motion for a new trial is filed sufficient time has invariably elapsed to enable counsel to examine the instructions and point out particularly those (usually only few in number) which are claimed to have been misleading and prejudicially erroneous. The burden of doing so should rest on the attorney making the motion. It is unfair to a trial judge to

reverse him for the giving of erroneous instructions which were not *specifically* called to his attention. . . . (Emphasis added.)

In the case at bar, some 31 instructions were given to the jury. The rationale of the Pajak opinion is thus clearly applicable here, and we must therefore consider defendant's objections to the instructions given and refused as having been waived. Rudolph v. City of Chicago, 2 Ill App2d 370, 374, 119 NE2d 528.

Having thus considered all of defendant's objections, and finding no reversible error, the judgment entered on the verdicts is affirmed.

Affirmed.

ENGLISH, P. J. and McCORMICK, J., concur.